Ashley PELMAN, a child under the age of 18 years, by her Mother and Natural Guardian Roberta Pelman, Roberta Pelman, Individually, Jazlyn Bradley, a child under the age of 18 years, by her Father and Natural Guardian Israel Bradley, and Israel Bradley, Individually, Plaintiffs,

v.

McDONALD'S CORPORATION, McDonald's Restaurants of New York, Inc., McDonald's 1865 Bruckern Boulevard, Bronx, New York, McDonald's 2630 Jerome Avenue, Bronx, New York, Defendants.

No. 02 CIV. 7821(RWS).

United States District Court, S.D. New York.

Jan. 22, 2003.

Samuel Hirsch & Associates, New York, NY by Samuel Hirsch, Esq., of Counsel, for Plaintiffs.

Winston & Strawn, New York, NY by Thomas J. Quigley, Esq., Bradley E. Lerman, Esq., Bruce R. Braun, Esq., of Counsel, Wildman, Harrold, Allen & Dixon, Chicago, IL by Anne G. Kimball, Esq., Sarah L. Olson, Esq., of Counsel, Harris Beach, LLP, New York, NY, by Judi Abbott Curry, Esq., Brian A. Bender, Esq., of Counsel, Badger & Levings, LLC, Kansas City, KS, by Elizabeth D. Badger, Esq., Theresa Levings, Esq., of Counsel, Balber, Pichard, Battistori, Maldonad & Vander Tuin, New York, NY, by Thomas P. Battistori, Esq., of Counsel, for Defendants.

*OPINION*

SWEET, District Judge.

## TABLE OF CONTENTS

Prior Proceedings ....519
Facts ....519
Parties ....519
Obesity in Young Persons and Its Effects ....519
Claims ....520
Discussion ....521

I. Diversity Jurisdiction Exists, and the Plaintiffs' Motion To Remand Is Denied ....521
 A. The Outlets ....521
 B. McDonalds of New York ....522
 C. The Outlets and McDonalds of New York Are Akin To Retailers And Distributors of McDonalds Corp.'s Products ....523

II. McDonalds' Motion to Dismiss ....524
 A. Standard of Review ....524
 B. Counts I and II: Plaintiffs Fail to State a Claim Pursuant to N.Y. Gen. Bus. Law §§ 349 and 350 ....524
 1. Federal Pre–Emption ....525
 2. Requirements of §§ 349 And 350 ....526
 a. Count I ....527

**516**

 i. Deceptive Acts ........................................ 527
 ii. Deceptive Omissions ................................. 529
 b. Count II ............................................. 530

III. Counts III, IV and V: Negligence Claims ............................. 530
 A. Count III: Inherently Dangerous Food .............................. 531
 1. Whether McDonalds Had a Duty to Plaintiffs Because the
 Dangers Were Not Within Common Knowledge ................. 531
 a. Allegations Within the Complaint ........................... 531
 b. Allegations Outside the Complaint........................... 533
 i. Plaintiffs' Claim that McDonalds' Products are More
 Dangerous than the Average Hamburger, Fries and
 Shake .......................................... 534
 ii. Allergic Sensitivity ...................................... 536
 iii. Foreseeable Misuse ..................................... 536
 iv. The NLEA ........................................... 537
 2. Proximate Cause ......................................... 537
 B. Count IV: Failure to Warn of Unhealthy Attributes .................. 540

IV. Count V: Sale of Addictive Products .................................... 542

V. Leave to Amend is Granted ........................................... 543

Conclusion ...................................................... 543

Defendants McDonald's Corporation ("McDonalds Corp."); McDonald's Restaurants of New York, Inc. ("McDonalds of New York"); McDonald's 1865 Bruckner Boulevard Bronx, New York ("Bruckner Boulevard outlet"); and McDonald's 2630 Jerome Avenue, Bronx, New York ("Jerome Avenue outlet") (collectively "McDonalds") have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint of class-action plaintiffs Ashley Pelman, Roberta Pelman, Jazlen Bradley, and Israel Bradley. The plaintiffs have cross-moved to remand the case to state court.

This action presents unique and challenging issues. The plaintiffs have alleged that the practices of McDonalds in making and selling their products are deceptive and that this deception has caused the minors who have consumed McDonalds' products to injure their health by becoming obese. Questions of personal responsibility, common knowledge and public health are presented, and the role of society and the courts in addressing such issues.

The issue of determining the breadth of personal responsibility underlies much of the law: where should the line be drawn between an individual's own responsibility to take care of herself, and society's responsibility to ensure that others shield her? Laws are created in those situations where individuals are somehow unable to protect themselves and where society needs to provide a buffer between the individual and some other entity—whether herself, another individual or a behemoth corporation that spans the globe. Thus Congress provided that essentially all packaged foods sold at retail shall be appropriately labeled and their contents described. The Nutrition Labeling and Education Act of 1990, Pub.L. 101–535, 104 Stat. 2353 (Nov. 8, 1990) (the "NLEA"), 21 U.S.C. § 343(q).[1] Also as a matter of fed-

---

**1.** The NLEA sought "to ensure that consumers have access to information about food that is scientifically valid, truthful, reliable, understandable and not misleading. This information will enable consumers to make more healthful food choices." Marilyn J. Schramm, Constitutional Protection of Commercial Speech Under the *Central Hudson* Test as Applied to Health Claims, 51 Food &

eral regulation, all alcoholic beverages must warn pregnant women against their use. 27 U.S.C. § 215 (forbidding sale of alcohol unless it bears the following statement: "GOVERNMENT WARNING: (1) According to the Surgeon General, women should not drink alcoholic beverages during pregnancy because of the risk of birth defects ...."); 27 C.F.R. § 16.21. Congress has gone further and made the possession and consumption of certain products criminal because of their presumed effect on the health of consumers.[2] Other products have created health hazards and resulted in extensive and expensive class action litigation. *E.g., Amchem Products v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (affirming denial of certification of class of potentially millions who had suffered injuries as a result of exposure to asbestos); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liability Litig.*, 282 F.3d 220, 225 (3d Cir.2002) (class action of six million who took diet drugs (Pondimin and Redux) that were later linked to valvular heart disease); *In re Breast Implant Cases*, 942 F.Supp. 958, 959–60 (S.D.N.Y. 1996) (discussing possibility of transfer of thousands of cases alleging injuries from silicone breast implants). Public health is one, if not the, critical issue in society.

This opinion is guided by the principle that legal consequences should not attach to the consumption of hamburgers and other fast food fare unless consumers are unaware of the dangers of eating such food. As discussed, *infra*, this guiding principle comports with the law of products liability under New York law. As Sir Francis Bacon noted, "*Nam et ipsa scientia potestas est*,"[3] or knowledge is power. Following from this aphorism, one important principle in assigning legal responsibility is the common knowledge of consumers. If consumers know (or reasonably should know) the potential ill health effects

Drug L.J. 323 (1996) (citation omitted); Mara A. Michaels, FDA Regulation of Health Claims Under the Nutrition Labeling and Education Act of 1990: A Proposal for a Less Restrictive Scientific Standard, 44 Emory L.J. 319, 327 (Winter 1995) ("Congress believed that if consumers were informed about the possible health benefits of foods, they would be better equipped to make appropriate food choices."). To promote these goals, Section 343(q) requires, *inter alia*, that non-exempted retail food be labeled with the following information: (1) the serving size; (2) the number of servings per container; (3) the total number of calories derived from any source and derived from fat; (4) the amount of total fat, saturated fat, cholesterol, sodium, total carbohydrates, complex carbohydrates, sugars, dietary fiber, and total protein per serving. 21 U.S.C. § 343(q)(1)(A)-(E).

2. In the interest of consistency and integrity, it should be noted that the author of this opinion publicly opposed the criminalization of drugs. *See* Stephen Labaton, "Federal Judge Urges Legalization of Crack, Heroin and Other Drugs," N.Y. Times at A1 (Dec. 13, 1989) ("Judge Sweet became the first Federal judge to propose publicly that illegal drugs be made legal ...."). This belief is based upon the notion that, as long as consumers have adequate knowledge about even harmful substances, they should be entitled to purchase them, and that the issue should be one of health, rather than of the criminal law. *E.g.,* Robert W. Sweet & Edward A. Harris, *Moral and Constitutional Considerations in Support of the Decriminalization of Drugs, in How To Legalize Drugs* 430, 433 (Jefferson M. Fish, ed. 1998) ("Ultimately, we favor a drug policy that would be comparable to the nation's current policy and legal framework regulating alcohol, and we suggest that support for such a policy—based on a right to self-determination—may be derived from the Ninth Amendment of the Constitution."). The same logic must apply in the situation of fast food, which is arguably less harmful and certainly less demonized than drugs that have been made illegal—unless, of course, this case is the opening salvo in the "War on Big Macs."

3. The phrase, which appeared in *De Haeresibus* (1597), is literally translated as "for knowledge itself is power."

of eating at McDonalds, they cannot blame McDonalds if they, nonetheless, choose to satiate their appetite with a surfeit of supersized McDonalds products. On the other hand, consumers cannot be expected to protect against a danger that was solely within McDonalds' knowledge. Thus, one necessary element of any potentially viable claim must be that McDonalds' products involve a danger that is not within the common knowledge of consumers. As discussed later, plaintiffs have failed to allege with any specificity that such a danger exists.

McDonalds has also, rightfully, pointed out that this case, the first of its kind to progress far enough along to reach the stage of a dispositive motion, could spawn thousands of similar "McLawsuits" against restaurants. Even if limited to that ilk of fare dubbed "fast food," the potential for lawsuits is great[4]: Americans now spend more than $110 billion on fast food each year, and on any given day in the United States, almost one in four adults visits a fast food restaurant. Eric Schlosser, *Fast Food Nation* 3 (2002) (hereinafter "Schlos-

ser"). The potential for lawsuits is even greater given the numbers of persons who eat food prepared at other restaurants in addition to those serving fast food. *See* FDA, Food Labeling; General Requirements for Health Claims for Food, 58 FR 2478, 2516, 1993 WL 1547 (Jan. 6, 1993) ("Almost half of the American food dollar is spent on food consumed away from home, and . . . perhaps as much as 30 percent of the American diet is composed of foods prepared in food service operations."). In light of these facts, the Court is cognizant of its duty "to limit the legal consequences of wrongs to a controllable degree and to protect against crushing exposure to liability." *McCarthy v. Olin Corp.*, 119 F.3d 148, 157 (2d Cir.1997) (*quoting Strauss v. Belle Realty Co.*, 65 N.Y.2d 399, 402, 492 N.Y.S.2d 555, 557, 482 N.E.2d 34 (1985)).

The interplay of these issues and forces has created public interest in this action, ranging from reports and letters to the Court to television satire.[5] Obesity, personal liberty and public accountability affect virtually every American consumer.

---

4. Indeed, The Economist in its Dec. 21, 2002 issue provided an Orwellian view from the year 2012 of what the potential success of fast-food lawsuits would do to the American landscape and culture. "Battling against big food," The Economist 108 (Dec. 21, 2002).

5. Much of the reaction has been negative. Debra Goldman, "Consumer Republic: common sense may not be McDonald's ally for long," ADWEEKE. Ed. 14 (12/02/02), 2002 WL 103089868 ("In dozens of on-the-street interviews and Web polls conducted since the suit made news last month, the masses have expressed their incredulity at and contempt for the litigious kids—and parents—who won't take responsibility for a lifetime of chowing down Happy Meals. With much tongue-clucking, the vox populi bemoans yet another symptom of the decline of personal responsibility and the rise of the cult of victimhood."). *See also* Sarah Avery, "Is Big Fat the Next Big Tobacco?" Raleigh News & Observer, at A25, 2002 WL 11733461 (Aug.

18, 2002) ("[A related] lawsuit has brought howls of dissent and derision—as yet another example of a litigious society run amok. How, indeed, could food be considered as addicting and harmful as smoking?"); Neil Buckley, "Big Food faces grilling over America's obesity 'epidemic,'" Fin. Times at P20 (11/27/02) (quoting founder of Center for Consumer Freedom, which gets funding from restaurants and food companies, as stating "The reality is that anyone with an IQ higher than room temperature will understand that excessive consumption of food served in fast-food restaurants will lead to weight gain."); "How did the lawyer keep from laughing?," S. Bend Trib. (Ind.) (08/13/02) ("[T]he fast-food lawsuit is generally regarded as a joke . . . ."); Amity Shlaes, "Lawyers get fat on McDonald's," Chicago Tribune, at 25 (11/27/02) ("Every now and then America draws a cartoon of herself for the amusement of the rest of the world. Last week's fat lawsuit against McDonald's is one of those occasions.").

In terms of the pending motion by McDonalds to dismiss the complaint, these principles require the complaint to be dismissed for lack of specificity, with leave granted to replead within the limits set forth below.

### Prior Proceedings

The plaintiffs commenced suit on August 22, 2002, in the State Supreme Court of New York, Bronx County. Defendants removed the action to the Southern District of New York on September 30, 2002, alleging as the basis of removal that the plaintiffs had fraudulently joined non-diverse parties in order to defeat diversity jurisdiction pursuant to 28 U.S.C. § 1332.

McDonalds filed the instant motion to dismiss plaintiffs' complaint (the "Complaint") on October 7, 2002. The plaintiffs cross-moved to remand and in opposition to the motion on October 25, 2002. Oral argument on both motions was held on November 20, 2002, and the motions were considered fully submitted at that time.

### Facts

As befits a motion to dismiss, the following facts are drawn from the allegations in the Complaint and do not constitute findings of fact by the Court.

### Parties

Ashley Pelman, a minor, and her mother and natural guardian Roberta Pelman are residents of the Bronx, New York.

Jazlen Bradley, a minor, and her father and natural guardian Israel Bradley are residents of New York, New York.

The infant plaintiffs are consumers who have purchased and consumed the defendants' products and, as a result thereof, have become overweight and have developed diabetes, coronary heart disease, high blood pressure, elevated cholesterol intake, and/or other detrimental and adverse health effects as a result of the defendants' conduct and business practices.

Defendant McDonald's Corp. is a Delaware corporation with its principal place of business at One McDonald's Plaza, Oak Brook, Illinois. It does substantial business with outlets in the State of New York, as well as throughout the fifty states. and the world.

Defendant McDonalds of New York is a New York State corporation with a registered agent office located at 80 State Street, Albany, New York. It does substantial business with outlets and/or franchises in the State of New York.

McDonalds is the owner, manager, franchisee and operator of defendants the Bruckner Boulevard and Jerome Avenue outlets. Ashley and Roberta Pelman purchased and consumed food products at the Bruckner Boulevard outlet. Jazlen and Israel Bradley purchased and consumed food products at the Jerome Avenue outlet. All products, ingredients, promotions and advertisements sold, provided, utilized, advertised and promoted by the Jerome Avenue and Bruckner Boulevard outlets were authorized by McDonalds Corp. and McDonalds of New York.

McDonalds Corp. and McDonalds of New York, through its agents, servants, and/or employees, operate both company-owned outlets and franchises, and prescribe their ingredients, qualities and quantities of the food products served, so as to insure that its food products sold in one state or location is substantially identical to food products sold elsewhere in the country.

### Obesity in Young Persons and its Effects

Today there are nearly twice as many overweight children and almost three times as many overweight adolescents as there were in 1980. In 1999, an estimated 61 percent of U.S. adults were overweight or obese and 13 percent of children aged 6 to 11 years and 14 percent of adolescents

aged 12 to 19 years were overweight. In 1980, those figures for children were 7 percent for children aged 6 to 11 years and 5 percent for adolescents aged 12 to 19 years.

Obese individuals have a 50 to 100 percent increased risk of premature death from all causes. Approximately 300,000 deaths a year in the United States are currently associated with overweight and obesity. As indicated in the U.S. Surgeon General's 2001 Report on Overweight and Obesity, "left unabated, overweight and obesity may soon cause as much preventable disease and death as cigarette smoking."

Obesity and overweight classification are associated with increased risk for coronary heart disease; type 2 diabetes; endometrial, colon, postmenopausal breast and other cancers; and certain musculoskeletal disorders, such as knee osteoarthritis.

Studies have shown that both modest and large weight gains are associated with significantly increased risk of diseases. For example, a weight gain of 11 to 18 pounds increases a person's risk of developing type 2 diabetes to twice that of individuals who have not gained weight, while those who gain 44 pounds or more have four times the risk of coronary heart disease (nonfatal myocardial infarction and death) of 1.25 times in women and 1.6 times in men. A gain of 22 pounds in men and 44 pounds in women result in an increased coronary heart disease risk of 1.75 and 2.65, respectively.

In certain obese women, the risk of developing endometrial cancer is increased by more than six times. Overweight and obesity are also known to exacerbate many chronic conditions such as hypertension and elevated cholesterol and such individuals may also suffer from social stigmatization, discrimination and poor body image.

In 1995, the total estimated costs attributable to obesity amounted to an estimated $99 billion. In 2000, the cost of obesity was estimated to be $117 billion. Most of the costs associated with obesity arise form type 2 diabetes, coronary heart disease and hypertension.

### Claims

The plaintiffs allege five causes of action as members of a putative class action of minors residing in New York State who have purchased and consumed McDonalds products. Counts I and II are based on deceptive acts and practices in violation of the Consumer Protection Act, New York Gen. Bus. Law §§ 349 and 350, and the New York City Administrative Codes, Chapter 5, 20–700 *et seq.* Count I alleges that McDonalds failed to adequately disclose the ingredients and/or health effects of ingesting certain of their food products with high levels of cholesterol, fat, salt and sugar; described their food as nutritious; and engaged in marketing to entice consumers to purchase "value meals" without disclosing the detrimental health effects thereof. Count II focuses on marketing techniques geared toward inducing children to purchase and ingest McDonalds' food products. Count III sounds in negligence, alleging that McDonalds acted at least negligently in selling food products that are high in cholesterol, fat, salt and sugar when studies show that such foods cause obesity and detrimental health effects. Count IV alleges that McDonalds failed to warn the consumers of McDonalds' products of the ingredients, quantity, qualities and levels of cholesterol, fat, salt and sugar content and other ingredients in those products, and that a diet high in fat, salt, sugar and cholesterol could lead to obesity and health problems. Finally, Count V also sounds in negligence, alleging that McDonalds acted negligently in marketing food products that were physically and psychologically addictive.

## Discussion

### I. Diversity Jurisdiction Exists, and the Plaintiffs' Motion to Remand Is Denied

In order to rule on this motion, this Court must have jurisdiction. Defendants removed to federal court alleging that diversity jurisdiction exists pursuant to 28 U.S.C. § 1332.

Section 1332 states, in pertinent part, that:

> (a) The district court shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between—
>
> (1) Citizens of different States ....

28 U.S.C. § 1332. Section 1332 requires complete diversity of citizenship; therefore no defendant may share citizenship with a plaintiff. *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 373–74, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978). There is no dispute that all of the plaintiffs are New York residents and that three of the defendants—McDonalds of New York, the Bruckner Boulevard outlet, and the Jerome Avenue outlet—are New York residents. Therefore, unless the three non-diverse defendants were "fraudulently joined" to defeat jurisdiction, complete diversity does not exist, and this Court lacks subject matter jurisdiction over the controversy.

As an initial matter, although this concept is described as "fraudulent joinder," suggesting that the determinative issue is one of motive, motive in fact has nothing to do with it. *In re Rezulin Prods. Liability Litig.,* 133 F.Supp.2d 272, 279 (S.D.N.Y. 2001) ("The only issue is whether the plaintiff has a legitimate claim against the non-diverse or in-state defendant—whether, in other words, the plaintiff has a real or direct interest in the controversy vis-a-vis the non-diverse or in-state defendant ....."). The standard for determining whether a plaintiff's claim against a defendant is sufficiently substantial to defeat removal jurisdiction is governed by *Pampillonia v. RJR Nabisco, Inc.,* 138 F.3d 459, 461 (2d Cir.1998).

In order to show that a non-diverse defendant was fraudulently joined to defeat diversity jurisdiction, the defendant must demonstrate, by clear and convincing evidence, either that there has been outright fraud committed in the plaintiffs' pleadings, or that there is no reasonable basis, based on the pleadings, for liability against the non-diverse defendants in light of the claims alleged. *Whitaker v. American Telecasting, Inc.,* 261 F.3d 196, 207 (2d Cir.2001) (*quoting Pampillonia,* 138 F.3d at 461). The burden on a removing defendant to meet this standard is a heavy one, and all reasonable doubts of fact and law are resolved in favor of the plaintiff. *Id.* "Nevertheless, the burden is not impossible of satisfaction." *In re Rezulin,* 133 F.Supp.2d at 280.

In order to interpret the legal standards stated above, it is necessary to look to the "realities of the record." *Rose v. Giamatti,* 721 F.Supp. 906, 915 (S.D.Ohio 1989). The discussion of whether the plaintiffs have stated a claim against the outlets and McDonalds of New York necessarily augurs the discussion, *infra,* of whether the Complaint should be dismissed. For ease of reading, this section summarizes the later analysis.

### A. The Outlets

Plaintiffs have chosen to join as defendants two of McDonalds' myriad outlets in New York State—both of which happen to be located in the Bronx, New York. As an initial matter, it is worth noting that this action is labeled a statewide class action, and any putative class members will cer-

tainly have eaten at other outlets than the ones named in the Complaint.

■ With regard to the claims under the Consumer Protection Act, as discussed *infra*, plaintiffs fail to cite any specific advertisements or public statements that may be considered "deceptive" on the part of any of the defendants, including the outlets. In addition, while the Complaint does cite to specific omissions on the part of all defendants—namely the failure to include nutritional labeling at points of purchase [6]—it does not claim that the outlets had any particular knowledge in their possession and not in the public's possession that would require them to post such information. Therefore, the plaintiffs have not stated a claim against the outlets under the Consumer Protection Act.

Plaintiffs also cannot state the negligence claims against the outlets. First, plaintiffs have failed to establish that any of the defendants have produced a product that was so unhealthy as to be outside a reasonable's consumer's expectations. A larger problem is raised here with regard to probable cause than that pointed out later in the discussion of McDonalds' motion to dismiss. Normally, a products liability action that is brought against retailers, distributors and manufacturers is premised on an injury that results from the use of a single item that was purchased from a particular retailer and distributor.[7] Here, however, the claim is premised on an over-consumption of products specified and provided by the national defendant, McDonalds Corp. In order to establish

proximate cause, the injury of over-consumption must somehow be tied to the outlets. Presumably, that would require, in addition to alleging the facts discussed *infra*, some allegation that plaintiffs ate primarily at the particular outlet. In the absence of such allegations, a claim against the outlets cannot stand.

## B. McDonalds of New York

The inclusion of McDonalds of New York is more logical than the inclusion of two of the many McDonalds outlets in New York State. Plaintiffs nonetheless fail to state a claim for similar reasons discussed above.

First, with regard to the Consumer Protection Act, there is no allegation of any specific advertisements or public statements arising from McDonalds of New York. Further, there is no allegation that McDonalds of New York had in its possession any particular knowledge that consumers did not have that would require it to promulgate information about the nutritional contents of the products. Therefore, the deceptive practices claim cannot stand against McDonalds of New York.

Second, the negligence claims fail for the same reasons discussed above and in greater detail below. There is no allegation that McDonalds of New York has produced or distributed a product that is so dangerous that its danger is outside the reasonable understanding of a consumer. Further, the proximate cause issues discussed below also inhibit this claim. It should be noted that the proximate cause

---

6. Because the outlets utilize labels presumably created at the national level, they cannot be responsible for the lack of nutritional labeling on the packaging itself.

7. A typical products liability case would involve a fact pattern where a plaintiff discovers something unsavory or dangerous in a meal purchased at a McDonalds outlet, such as, for instance, a chicken head. *E.g.,* "You Deserve

a Beak Today," The Wash. Post, at C13 (Dec. 1, 2000) (reporting that a Newport News, Virginia woman found breaded and fried chicken head—including the beak, eyes and comb—in a box of McDonalds chicken wings). Such a situation clearly ties in the outlet that sold that particular order of chicken wings. Of course, New York's specific rules concerning liability of retailers and distributors also applies, as discussed in Part I.C.

issue discussed above—tying the injury to a particular outlet—is not as damaging against the claim against McDonalds of New York. However, plaintiffs must allege that they have eaten primarily, if not wholly, at McDonalds of New York outlets. In other words, a plaintiff who has lived for merely a year in New York State—and thus eaten at outlets run by McDonalds of New York only for one year—may have a difficult time in showing causation. The absence of explicit allegations to this effect provides a further ground for dismissal of the Complaint as against McDonalds of New York.

### C. The Outlets and McDonalds of New York Are Akin to Retailers and Distributors of McDonalds Corp.'s Products

In addition, because the outlets and McDonalds of New York are akin to retailers and distributors of a manufacturer's products, the negligence claims cannot attach to the outlets and McDonalds of New York for the following reasons.

 Under New York law,[8] a wholesaler, retailer or distributor can be held liable in negligence for the sale of a defective product or for failure to warn only if it fails to detect a dangerous condition that it could have discovered during the course of a normal inspection while the product was in its possession. *E.g., Sideris v. Simon A. Rented Servs.,* 254 A.D.2d 408, 409, 678 N.Y.S.2d 771, 772 (2d Dep't 1998) (holding rental service not liable for defective condition because satisfied duty to inspect) (*citing Naples v. City of New York,* 34 A.D.2d 577, 578, 309 N.Y.S.2d 663, 666 (2d Dep't

1970)); *Luckern v. Lyonsdale Energy Ltd. Partnership,* 281 A.D.2d 884, 887, 722 N.Y.S.2d 632, 637 (4th Dep't 2001) (failure to warn) (*citing McLaughlin v. Mine Safety Appliances Co.,* 11 N.Y.2d 62, 70–71, 181 N.E.2d 430, 433, 226 N.Y.S.2d 407, 413 (1962)).

It is unclear whether the defects in question—high levels of cholesterol, fat, salt and sugar—were "discoverable" upon "inspection."[9] Given McDonalds' common knowledge arguments with regard to the attributes, however, it may be assumed so. In any case, however, those attributes are later found insufficient as a matter of law to establish products liability. In order to state a claim against the outlets and McDonalds of New York, the plaintiffs must allege that they were in possession of information that the McDonalds Corp. products that they sold were more dangerous than a reasonable consumer would expect. Plaintiffs have failed to make such allegations.

This lawsuit is not the typical products liability case because, as referred to above, the issue is over-consumption of products created, manufactured and advertised at a national level. A McDonalds' Big Mac is the same at every outlet in the Bronx, New York; the same at every outlet in the State of New York; and the same at every outlet throughout the United States. Clearly what is at issue in this lawsuit is the national menu and national policy of McDonalds Corp., and the plaintiffs' real beef is with McDonalds Corp.

As a result, the motion to remand is denied.

---

**8.** As both parties have invoked New York law, there is no need to undertake a choice of law inquiry. *Pampillonia v. RJR Nabisco, Inc.,* 138 F.3d 459, 461 n. 4 (2d Cir.1998) (*citing American Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir.1997); *Wm. Passalacqua Builders v. Resnick Developers,* 933 F.2d 131, 137 (2d Cir.1991); *Walter E. Heller*

*& Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir.1984)).

**9.** By contrast, to return to the example of the fried chicken head (*supra* note 7), such defective product clearly should have been discovered upon inspection.

## II. *McDonalds' Motion to Dismiss*

### A. *Standard of Review*

In reviewing a motion to dismiss under Rule 12(b)(6), courts must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993) (*citing IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir.1993)). However, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114, 122 (S.D.N.Y.1988). The complaint may only be dismissed when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996); *Allen v. West-Point–Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991).

Review must be limited to the complaint and documents attached or incorporated by reference thereto. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). In this context, the Second Circuit has held that a complaint is deemed to "include ... documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000).

Plaintiffs, however, in their opposition papers rely on facts outside the pleading.

The Court of Appeals has made clear that where a District Court is provided with materials outside the pleadings in the context of a 12(b)(6) motion to dismiss, it has two options: the court may exclude the additional materials and decide the motion on the complaint alone or convert the motion to one from summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material. Fed.R.Civ.P. 12(b). *Kopec v. Coughlin*, 922 F.2d 152, 154 (2d Cir.1991) (*quoting Fonte v. Board of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir.1988)). The Court has not converted this motion to one for summary judgment and thus will not consider statements outside the pleadings in reaching its holding.

### B. *Counts I and II: Plaintiffs Fail to State a Claim Pursuant to N.Y. Gen. Bus. Law §§ 349 and 350*

Counts I and II allege that McDonalds violated the New York Consumer Protection Act, N.Y. Gen. Bus. Law §§ 349 and 350, by (1) deceptively advertising their food as not unhealthful and failing to provide consumers with nutritional information (Count I) and (2) inducing minors to eat at McDonalds through deceptive marketing ploys (Count II).[10]

 Section 349 of New York General Business Law makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a).[11] Section

---

**10.** The Complaint also asserts that such actions violated the City of New York's Consumer Protection Law, Admin. Code, Chapter 5, 20–700 *et seq.* McDonalds argues, and the plaintiffs do not contest, that such actions may only be brought by the Commissioner of Consumer Affairs. *E.g., Galerie Furstenberg v. Philip Coffaro*, 697 F.Supp. 1282, 1292 (S.D.N.Y.1988). Therefore, Counts I and II

are dismissed to the extent they assert claims pursuant to the Administrative Code.

**11.** As indicated by the statute's "expansive" language, section 349 was intended to be broadly applicable, extending far beyond the reach of common law fraud. *Blue Cross and Blue Shield of New Jersey*, 178 F.Supp.2d at 230–31 (upholding claim under section 349

350 prohibits "[f]alse advertising in the conduct of any business." N.Y. Gen. Bus. Law § 350. To state a claim for deceptive practices under either section, a plaintiff must show: (1) that the act, practice or advertisement was consumer-oriented; (2) that the act, practice or advertisement was misleading in a material respect, and (3) that the plaintiff was injured as a result of the deceptive practice, act or advertisement. *E.g., Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (2000); *St. Patrick's Home for Aged and Infirm v. Laticrete Intern., Inc.*, 264 A.D.2d 652, 655, 696 N.Y.S.2d 117, 122 (1st Dep't 1999); *BNI N.Y. Ltd. v. DeSanto*, 177 Misc.2d 9, 14, 675 N.Y.S.2d 752, 755 (N.Y.City Ct.1998). *See also Berrios v. Sprint Corp.*, 1998 WL 199842, at *3 (E.D.N.Y. March 16, 1998). The standard for whether an act or practice is misleading is objective, requiring a showing that a reasonable consumer would have been misled by the defendant's conduct. *Marcus v. AT&T*, 138 F.3d 46, 64 (2d Cir.1998); *Oswego Laborers' v. Marine Midland Bank*, 85 N.Y.2d 20, 26, 623 N.Y.S.2d 529, 533, 647 N.E.2d 741 (1995). Omissions, as well as acts, may form the basis of a deceptive practices claim. *Stutman*, 95 N.Y.2d at 29, 709 N.Y.S.2d 892, 731 N.E.2d 608 (*citing Oswego Laborers'*, 85 N.Y.2d at 26, 623 N.Y.S.2d 529, 647 N.E.2d 741 (delineating different inquiry in case of claim of deceit by omission)). Further, traditional showings of reliance and scienter are

that tobacco companies engaged in scheme to distort public knowledge concerning risks of smoking); *Gaidon v. Guardian Life Ins. Co. of Am.*, 94 N.Y.2d 330, 343, 704 N.Y.S.2d 177, 182, 725 N.E.2d 598, 603 (1999) ("In contrast to common-law fraud, General Business Law § 349 is a creature of statute based on broad consumer-protection concerns."); *Karlin v. IVF Am., Inc.*, 93 N.Y.2d 282, 291, 690 N.Y.S.2d 495, 498, 712 N.E.2d 662, 665 (1999) ("The reach of th[is] statut[e] 'provide[s] needed authority to cope with the numerous, ever-changing types of

not required under the act. *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 178 F.Supp.2d 198, 231 (E.D.N.Y.2001) (Weinstein, J.).

McDonalds argues that plaintiffs' claims under §§ 349 and 350 fail because (1) they are not plead with sufficient specificity, and (2) acts or practices cannot be deceptive if the consuming public is already aware of the "concealed" characteristics and therefore is not deceived. McDonalds also argued for the first time in its reply papers that plaintiffs' claims are pre-empted by federal law. Although raised last, the pre-emption argument will be addressed first.

### 1. Federal Pre–Emption

McDonalds raises for the first time in its reply brief[12] an argument that its compliance with (or rather, exemption from) the Federal Nutritional Labeling and Education Act, 21 U.S.C. § 343(q), bars the plaintiffs' contentions that McDonalds' failure to provide nutritional information is deceptive. Defs.' Reply Mem. at 24. Section 343(q) requires labels with specified nutritional values to be attached to all packaged food, but it specifically exempts restaurants from this requirement. 21 U.S.C. § 343(q)(5)(A)(i) (labeling requirements "shall not apply to food which is served in restaurants or other establishments in which food is served for immediate human consumption or which is sold for sale or use in such establishments").

false and deceptive business practices which plague consumers in our State.' ") (*quoting* N.Y. Dept. of Law, Mem. to Governor, 1963 N.Y. Legis. Ann., at 105).

12. The argument will be addressed although raised tardily because the plaintiffs had an opportunity to respond in their sur-reply brief, because the §§ 349 and 350 claims are to be dismissed on other grounds in any case, and because it is held that the claims are not pre-empted.

McDonalds thus argues that if Congress determined that restaurants should not have to label their food, McDonalds cannot be made to do so indirectly, pursuant to a New York State statute.

State law that conflicts with federal law is without effect. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (*citing Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). However, "the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." *Id.* (brackets in original) (*quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)).

Section 343–1, the NLEA's pre-emptive provision, provides that no state may require nutrition labeling for food in interstate commerce that is not identical to that prescribed by the NLEA. 21 U.S.C. § 343–1(a)(4); *see also Morelli v. Weider Nutrition Group, Inc.*, 275 A.D.2d 607, 607, 712 N.Y.S.2d 551 (1st Dep't 2000). This provision would seem to support McDonalds' argument. However, subsection (4) of the pre-emptive provision specifically permits states to require nutrition labeling of food that is exempt under subclause (i) or (ii) of 21 U.S.C. § 343(q)(5)(A). 21 U.S.C. § 343–1(a)(4). As noted above, § 343(q)(5)(A)(i) is the very provision on which McDonalds relies to state that it has "complied" with federal regulations and that the State of New York cannot make it do anything more.

Therefore, § 343–1(a)(4) does not expressly bar nutrition labeling on restaurant foods either directly or, as plaintiffs seek to do in this action based on a New York state statute, indirectly. A finding that a lack of nutritional labeling on McDonalds' products violates §§ 349 and 350 therefore is explicitly not pre-empted by the NLEA. In fact, in discussing its rules and regulations implementing the NLEA, the Food and Drug Administration recognized that states could protect their consumers in this manner. FDA, Food Labeling; General Requirements for Health Claims for Food, 58 FR 2478, 2517, 1993 WL 1547 (1993) ("States remain free, however, to ensure under their own consumer protection laws that menus do not provide false or misleading information."). McDonalds' late-breaking arguments are accordingly rejected.

### 2. *Requirements of §§ 349 and 350*

McDonalds argues that plaintiffs' claims under §§ 349 and 350 fail because (1) they are not plead with sufficient specificity, and (2) acts or practices cannot be deceptive if the consuming public is already aware of the "concealed" characteristics and therefore is not deceived.

A plaintiff must plead with specificity the allegedly deceptive acts or practices that form the basis of a claim under the Consumer Protection Act. *E.g., Weaver v. Chrysler Corp.*, 172 F.R.D. 96, 100 (S.D.N.Y.1997) ("In pleading a claim under the Consumer Protection Act, a plaintiff is required to set forth specific details regarding the allegedly deceptive acts or practices."); *Moses v. Citicorp Mortg. Inc.*, 982 F.Supp. 897, 903 (E.D.N.Y.1997) ("Conclusory allegations have been held insufficient to state a claim under section 349."); *Grand Gen. Store, Inc. v. Royal Indem. Co.*, No. 93 Civ. 3741 (CSH), 1994 WL 163973, at *4 (S.D.N.Y. April 22, 1994) (discussing violation of Insurance Law alleged to be deceptive practice under § 349). *See also Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 9, 679 N.Y.S.2d 593, 600 (1st Dep't 1998) ("plaintiffs do not point to any specific advertisement or public pronouncement").

For instance, one of the cases on which plaintiffs rely, *Blue Cross and Blue Shield of New Jersey*, 178 F.Supp.2d at 269–70,

provides examples of such specific statements. The case involved a claim under § 349 against cigarette manufacturers, alleging deceptive practices. In the 175–page complaint, filed on April 29, 1998, the plaintiffs included a number of specific allegations of deceptive acts and practices, including the following:

- a statement that "no causal link between smoking and disease has been established" (*Blue Cross* Complaint, ¶ 112);
- a letter to a grade school principal stating that "scientists don't know the cause or causes of the chronic diseases reported to be associated with smoking" (*Id.*, ¶ 113);
- testimony under oath by a tobacco executive that he did not believe that people die from smoking (*Id.*, ¶ 114);
- Congressional testimony by tobacco executives stating that tobacco companies did not manipulate, add, control or restore nicotine during the manufacturing process (*Id.*, ¶ 219);
- advertisements denying that tobacco companies believed cigarette smoking was addictive (*Id.*, ¶ 220); and
- statements in newspaper advertisements that claimed "Phillip Morris does not believe that cigarette smoking is addictive" (*Id.*, ¶ 221).

Many of the practices were found to have supported liability in the opinion on which the plaintiffs rely. *Blue Cross and Blue Shield of New Jersey*, 178 F.Supp.2d at 269–70. Because such statements are necessarily "consumer-oriented" and thus in the public domain, plaintiffs should be able similarly to point to the specific statements that form the basis of their claims pursuant to §§ 349 and 350.

### a. *Count I*

In Count I, plaintiffs allege that McDonalds violated the act both by commission (*e.g.*; stating that its products were nutritious, encouraging consumers to "supersize" their meals without disclosing the negative health effects) and by omission (*e.g.*, failing to provide nutritional information for products).

### i. *Deceptive Acts*

Because the Complaint does not identify a single instance of deceptive acts, Count I shall be dismissed to the extent it alleges deceptive practices of commission in violation of §§ 349 and 350.

 Although the Court is limited to allegations in the Complaint for the purposes of deciding this motion, *Kramer*, 937 F.2d at 773, it is worth noting that, even in their opposition papers, the plaintiffs only cite to two advertising campaigns ("McChicken Everyday!" and "Big N' Tasty Everyday") and to a statement on the McDonalds' website that "McDonalds can be part of any balanced diet and lifestyle." These are specific examples of practices, act or advertisements and would survive a motion to dismiss based on lack of specificity. Whether they would survive a motion to dismiss on the substantive issue of whether such practices, act and advertisements are deceptive is less clear. The two campaigns encouraging daily forays to McDonalds and the statement regarding making McDonalds a part of a balanced diet, if read together, may be seen as contradictory—a balanced diet likely does not permit eating at McDonalds everyday.[13] However, the advertisements encouraging persons to eat at McDonalds "everyday!" do not include any indication

---

13. Of course, some people manage to eat at McDonalds everyday with no apparent ill effects. Witness the well-publicized fact that a Wisconsin man, Don Gorske, has eaten a Big Mac a day for approximately 30 years, while maintaining his svelte 178–pound, six-foot frame and a modest cholesterol level. *E.g.*, "Man Eats His 18,000th Big Mac," available at www.click2houston.com/sh/news/stories/nat –news–10559572001106191107.html

that doing so is part of a well-balanced diet, and the plaintiffs fail to cite any advertisement where McDonalds asserts that its products may be eaten for every meal of every day without any ill consequences. Merely encouraging consumers to eat its products "everyday" is mere puffery,[14] at most, in the absence of a claim that to do so will result in a specific effect on health.[15] As a result, the claims likely would not be actionable if alleged. *See Cytyc Corp. v. Neuromedical Sys. Inc.*, 12 F.Supp.2d 296, 301 (S.D.N.Y.1998) ("the sort of subjective claims of product quality at issue here are nonactionable"); *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995) (finding claim of "thorough" research to be "mere puffery" and not actionable as false advertising under § 43(a) of Lanham Act); *Chevy's Int'l Inc. v. Sal De Enters., Inc.*, 697 F.Supp. 110, 112 (E.D.N.Y.1988) ("that characterization, even if factually incorrect, was standard industry puffing that does not rise to the level of consumer deception").

On December 11, 2002, the Court accepted from plaintiffs a number of documents concerning actions taken against McDonalds' advertising practices in the late 1980's by the state attorneys general from several states, including New York State. While any claim based on the advertisements at issue likely would be time barred, *Morelli v. Weider Nutrition Group, Inc.*, 275 A.D.2d 607, 608, 712 N.Y.S.2d 551 (1st Dep't 2000) (three-year limitations period for deceptive practices actions), a review of those advertisements and the state attorney generals' analysis of them may assist plaintiffs in shaping a claim under the Consumer Protection Act. For instance, by letter dated April 24, 1987 (the "Abrams Letter"), Robert Abrams, the then-Attorney General of the State of New York, addressed several specific allegedly deceptive claims in McDonalds advertisements:

1. The advertisement discussing salt (sodium) content in foods says, "Our sodium is down *across the menu*." (emphasis added) This is not true. That same advertisement lists four products (regular fries, regular cheeseburger, 6–piece McNuggets, and vanilla milkshake), none of which have had their sodium content lowered in the past year.

(last visited Jan. 6, 2003) (reporting that Gorske set world record for number of Big Macs eaten while maintaining modest cholesterol level of 155); "Deserving a Break—and Getting It Every Day," AFSCME website, available at www.afscme.org/publications/public_employee/2002/pejf0221.htm (last visited Jan. 6, 2003) (noting that Gorske has consumed more than 800 heads of lettuce, 820 onions, 1,900 whole pickles, 563 pounds of cheese, 100 gallons of special sauce, 14½ cattle, and 6.25 million sesame seeds, but that he skips breakfast and dinner and only eats lunch of Big Mac, fries and Coke).

**14.** Puffery is defined as exaggerated general statements that make no specific claims on which consumers could rely. *E.g., Coastal Communs. Corp. v. Adams/Laux Co.*, No. 96 Civ. 1369(JSM), 1996 WL 546880, at *1 1996 U.S. Dist. LEXIS 14081, at *2–*3 (S.D.N.Y. Sept. 24, 1996) (*citing Cook, Perkiss & Liehe v.*

*Northern California Collection Serv.*, 911 F.2d 242, 246 (9th Cir.1990)).

**15.** For example, one of McDonalds' competitors, SUBWAY Restaurants, has engaged in just such a campaign, highlighting that it is the "healthier alternative to fatty fast food." SUBWAY website, press release (Nov. 18, 1999), available at www.subway.com/society/public_rel/pcr_press/111899pr.htm (last visited Jan. 6, 2003). Furthermore, it has hired as a spokesman Jared S. Fogle and has widely publicized the results of Mr. Fogle's "SUBWAY diet." Over the course of less than a year, Fogle went from 425 pounds to 190 pounds by eating his only meals from SUBWAY's low-fat menu. SUBWAY website, "Jared's Statistics," available at www.subway.com/society/foj/jared_stats.stm (last visited Jan. 6, 2003). Plaintiffs, however, have not referred the Court to any similar advertisements by McDonalds.

2. The advertisement touting the "real" milk in McDonald's shakes says that they contain "Wholesome milk, natural sweeteners, a fluid ounce of flavoring, and stabilizers for consistency. And that's all." In fact, that's not really all. McDonald's own ingredient booklet shows that a typical shake, such as vanilla or strawberry, actually contains artificial flavor and sodium benzoate and sodium hexametaphosphate, two chemical preservatives. This advertisements tells only part of the story.

3. The cholesterol advertisement emphasizes the relatively low (29 milligrams) cholesterol content of the regular hamburger, but does not even mention the saturated fat content, a fact much more relevant to those with cause for concern about heart disease.

Abrams Letter, at 1–2.

### ii. *Deceptive Omissions*

The second subset of Claim I focuses on McDonalds' failure to label its foods with their nutritional content. Unlike above, the plaintiffs clearly have outlined the allegedly deceptive practice: the fact that McDonalds failed to post nutritional labeling on the products and at points of purchase. However, because this is a purportedly deceptive act based on an omission, it is not sufficient for the plaintiffs to point to the omission alone. They must also show why the omission was deceptive—a duty they have shunned.

The New York Court of Appeals has addressed what § 349 requires in a situation involving an allegedly deceptive omission. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25–26, 623 N.Y.S.2d 529, 532, 647

N.E.2d 741 (1995) (Kaye, C.J.) involved a claim that defendant bank acted deceptively in not informing the plaintiff that for-profit entities would not receive interest on accounts in excess of $100,000. The Court reasoned that in a case involving omissions, "the statute surely does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation." *Id.* It provided an exception, however, "where the business alone possesses material information that is relevant to the consumer and fails to provide this information." *Id.* It was thus held that the plaintiffs had stated a cause of action, but that liability would turn on whether the plaintiffs possessed, or could reasonably have obtained, the information regarding interest on for-profit entities' accounts in excess of $100,000. *Id.* at 27, 623 N.Y.S.2d 529, 647 N.E.2d 741; *see also Super Glue v. Avis Rent A Car Sys. Inc.*, 159 A.D.2d 68, 71, 557 N.Y.S.2d 959, 961 (2d Dep't 1990) (rejecting claim for deceptive practices based on Avis's failure to disseminate information that its Collision Damage Waiver insurance duplicated the plaintiffs' own automobile insurance because Avis had no duty to inform where the customer with CDW coverage in place was in a far better position to ascertain the relevant conditions and exclusions relating to his or her coverage than Avis).

The plaintiffs fail to allege that the information with regard to the nutritional content of McDonalds' products was solely within McDonalds' possession or that a consumer could not reasonably obtain such information.[16] It cannot be assumed that the nutritional content of McDonalds' products and their usage was solely within the possession of McDonalds.

---

**16.** Although the plaintiffs do not allege it as part of Count I or II, the allegations contained in Count V—that McDonalds serves addictive products—would present a closer question as to a deceptive omission in violation of the Act, as such information is not available to the public.

### b. *Count II*

 Count II, which focuses on representations targeting children, fails for the same reasons discussed above. The Complaint does not identify a single specific advertisement, promotion or statement directed at infant consumers, and Count II must be dismissed in the absence of such specificity.

As with the first subset of Count I, the plaintiffs have attempted to point out potential specific acts in their opposition papers. They focus on two specific promotions geared toward minors: (1) a plastic beef steak figure named "Slugger," accompanied by a nutritional pamphlet encouraging children to eat two servings a day in the meat group to "make it easier to do things like climb higher and ride your bike farther," (Pls.' Mem. at 48–49 n. 53) and (2) promotions of the "Mighty Kids Meal," a souped-up Happy Meal, that equate eating the larger-portioned meal with being more grown-up. With regard to the latter, plaintiffs still fail to identify specific exhortations or promises associated with the Mightier Kids Meals, and such bare allegations would also be dismissed for lack of specificity were they included in an amended complaint. In any case, if plaintiffs are only concerned about the appellation "Mightier Kids Meal," such name is seemingly mere puffery, rather than any claim that children who eat a "Mightier Kids Meal" will become mightier. The former is sufficiently specific, were it included in the Complaint, to survive a motion to dismiss for failure to state a claim with sufficient specificity. Of course, plaintiffs would still have to set forth grounds to establish that the promotion was deceptive and that they suffered some injury as a result of that particular promotion.

The plaintiffs also raise for the first time in their opposition papers an argument that McDonalds has acted duplicitously in claiming that it is committed to providing nutritional information to its customers. This argument also fails for lack of specificity; the plaintiffs do not cite to a particular recent occasion [17] where McDonalds has stated such commitment. Even if this allegation were to be included in the Complaint, its deceptive nature is unclear. Plaintiffs admit that McDonalds has made its nutritional information available online *and do not contest that such information is* available upon request. Unless McDonalds has specifically promised to provide nutritional information on all its products and at all points of purchase, plaintiffs do not state a claim.

### III. *Counts III, IV and V: Negligence Claims*

The plaintiffs' common law claims against McDonalds sound in negligence, alleging that McDonalds was negligent in manufacturing and selling its products and negligent in failing to warn consumers of the potential hazards of eating its products. McDonalds argues that each of these claims fail as a matter of law because (1) the attributes about which plaintiffs complain were so well-known that McDonalds had no duty either to eliminate

---

**17.** As discussed above, plaintiffs have produced a number of documents from the late 1980's concerning discussions between McDonalds and state attorneys general, including the attorney general of the State of New York, requiring the discontinuance of certain advertising practices. As also discussed above, any cause of action based on such statements would likely be barred by the statute of limitations. *E.g., Morelli v. Weider Nutrition Group, Inc.,* 275 A.D.2d 607, 608, 712 N.Y.S.2d 551 (1st Dep't 2000) (three-year limitations period for deceptive practices actions). The same is true for the advertisements plaintiffs cite to from *McDonalds v. Steele,* No.1990–M–No.S724, presented in the United Kingdom, Royal Courts of Justice. Pls.' Mem. at 7.

such attributes or to warn plaintiffs about them, and (2) the plaintiffs cannot establish proximate cause.

### A. Count III: Inherently Dangerous Food

**1. Whether McDonalds Had a Duty to Plaintiffs Because the Dangers Were Not Within Common Knowledge**

In addition to the allegations in the Complaint with regard to McDonalds' duty, arguments raised for the first time in the papers on this motion will be addressed.

#### a. Allegations Within the Complaint

Count III essentially alleges that McDonalds' products are inherently dangerous because of the inclusion of high levels of cholesterol, fat, salt and sugar. McDonalds argues that because the public is well aware that hamburgers, fries and other fast food fare have such attributes, McDonalds cannot be held liable. *E.g., Olliver v. Heavenly Bagels, Inc.*, 189 Misc.2d 125, 127, 729 N.Y.S.2d 611, 613 (2001) ("Where as here a product by its very nature has a dangerous attribute, liability is imposed only when the product has an attribute not reasonably contemplated by the purchaser or is unreasonably dangerous for its intended use.") (*quoting Huppe v. Twenty–First Century Restaurants*, 130 Misc.2d 736, 738, 497 N.Y.S.2d 306 (1985)

(*citing Robinson v. Reed–Prentice Div. of Package Mach. Co.*, 49 N.Y.2d 471, 479, 426 N.Y.S.2d 717, 720, 403 N.E.2d 440 (1980))).

McDonalds cites to the Restatement (Second) of Torts and claims that because plaintiffs' claims hinge on injuries resulting from excessive consumption of food, they face a high bar indeed:

Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to some diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably dangerous" .... The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fuel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous.[18] Good butter is not unreasonably danger-

---

**18.** McDonalds, when citing the above passage, did not quote the sentence concerning "good tobacco." Likely this is because the authors of the Restatement, writing in the 1960's, did not envision the successful tobacco litigation and settlements of the 1990's. *See* Comment, Forcing Round Classes Into Square Rules: Attempting Certification of Nicotine Addiction–as–Injury Class Actions Under Federal Rule of Civil Procedure 23(b)(3), 29 U. Tol. L.Rev. 699, 700–01 (Summer 1998) (discussing failure of tobacco litigation from the 1950's until 1994 when new theory of addiction-as-injury emerged based

on " 'decades-long industry effort to conduct, control, and ultimately suppress' the results of the industry's extensive research into tobacco's addiction potential and the industry's ultimately exploitation of this potential") (citation omitted); Jon D. Hanson & Kyle D. Logue, The Costs of Cigarettes: The Economic Case for Ex Post Incentive Based Regulation, 107 Yale L.J. 1163, 1169–71 (March 1998) (discussing unsuccessful waves of litigation up until recently and that recent cases—as a result, *inter alia*, of revelations that tobacco companies knew cigarettes were addictive

ous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.

Restatement (2d) of Torts, § 402A, cmt. i.[19]

When asked at oral argument to distinguish this case from those cases involving injuries purportedly caused by asbestos exposure, counsel for the defendants stated that in this case, the dangers complained of have been well-known for some time, while the dangers of asbestos did not became apparent until years after exposure. The Restatement provision cited above confirms this analysis, recognizing that the dangers of over-consumption of items such as alcoholic beverages, or typically high-in-fat foods such as butter, are well-known. Thus any liability based on over-consumption is doomed if the consequences of such over-consumption are common knowledge.

It is worth noting, however, that the Restatement provision cited above included tobacco as an example of products such as whiskey and butter, the unhealthy over-consumption of which could not lead to liability. As the successful tobacco class action litigation and settlements have shown, however, the fact that excessive smoking was known to lead to health problems did not vitiate liability when, for instance, tobacco companies had intentionally altered the nicotine levels of cigarettes to induce addiction. *E.g., Burton v. R.J. Reynolds Tobacco Co.,* 205 F.Supp.2d 1253, 1254–55 (D.Kan.2002) (noting jury verdict in favor of plaintiff's claims on failure to warn, negligent testing and research and fraudulent concealment based on assertions that defendant cigarette manufacturer caused his peripheral vascular disease and addiction).

■ Thus, in order to state a claim, the Complaint must allege either that the attributes of McDonalds products are so extraordinarily unhealthy that they are outside the reasonable contemplation of the consuming public or that the products are so extraordinarily unhealthy as to be dangerous in their intended use. The Complaint—which merely alleges that the foods contain high levels of cholesterol, fat, salt and sugar, and that the foods are therefore unhealthy—fails to reach this bar. It is well-known that fast food in general, and McDonalds' products in particular, contain high levels of cholesterol, fat, salt, and sugar, and that such attributes are bad for one.[20]

---

and manipulated the addictiveness through controlling nicotine levels—"pose a considerable threat to the cigarette industry"); *see also, e.g., Burton v. R.J. Reynolds Tobacco Co.,* 205 F.Supp.2d 1253, 1254–55 (D.Kan.2002) (noting jury verdict in favor of plaintiff's claims on failure to warn, negligent testing and research and fraudulent concealment based on assertions that defendant cigarette manufacturer caused his peripheral vascular disease and addiction).

This lack of foresight suggests that perhaps the Restatement's vision concerning over-consumption may be rendered obsolete. Seemingly "good" products may be manipulated such that they are more akin to fuel-oil contaminated whiskey and marijuana-laced cigarettes.

19. Relevant to Count IV, it also stated that "a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized." *Id.,* § 402A, cmt. j; *see also Plummer v. Lederle Labs.,* 819 F.2d 349, 356 n. 4 (2d Cir.1987).

20. *E.g.,* John DeMers, "Fat Chance—Fast-food diet increases odds of obesity," Houston Chron. at 1, 2001 WL 23635886 (Sept. 27, 2001) ("The more fast food there was in America, the fatter America became. And the more likely a segment of the population was to devour fast food regularly, the more it became fatter than any other segment.

This rule makes sense in light of the policy issues discussed at the outset of this opinion. If a person knows or should know that eating copious orders of super-sized McDonalds' products is unhealthy and may result in weight gain (and its concomitant problems) because of the high levels of cholesterol, fat, salt and sugar, it is not the place of the law to protect them from their own excesses. Nobody is forced to eat at McDonalds. (Except, perhaps, parents of small children who desire McDonalds' food, toy promotions or play-grounds and demand their parents' accompaniment.[21]) Even more pertinent, nobody is forced to supersize their meal or choose less healthy options on the menu.

As long as a consumer exercises free choice with appropriate knowledge, liability for negligence will not attach to a manufacturer. It is only when that free choice becomes but a chimera—for instance, by the masking of information necessary to make the choice, such as the knowledge that eating McDonalds with a certain frequency would irrefragably cause harm—that manufacturers should be held accountable. Plaintiffs have failed to allege in the Complaint that their decisions to eat at McDonalds several times a week were anything but a choice freely made and which now may not be pinned on Mc-Donalds.

#### b. Allegations Outside the Complaint

In an attempt to save their common law causes of action, plaintiffs raise four arguments that are not alleged in the Complaint to show that McDonalds has a duty toward plaintiffs: (1) McDonalds' products have been processed to the point where they have become completely different and more dangerous than the run-of-the-mill products they resemble and than a reasonable consumer would expect; (2) plaintiffs have an allergic sensitivity to McDonalds' products; (3) McDonalds should know that consumers would misuse products (presumably by eating in larger quantities or at greater frequencies than is healthy); and (4) policy arguments based upon the Nutrition Labeling and Education Act. While the Court may only consider allegations in the Complaint for the purposes of this motion, Kramer, 937 F.2d at 773, these arguments are important in determining whether the plaintiffs should have the right to amend their complaint, as they point to potentially viable claims, and thus will briefly be addressed.

Though we are ultimately responsible for what we eat, fast food was 'making' us fat."); Caroline Foulkes, "Food & drink—Can't do the cooking? Burger it." Birmingham Post, at P46 (9/21/02) ("Doctors have been warning us of the dangers of eating too much fast food since burger outlets first became popular in Britain in the 1960's. But their advice has gone unheeded."); Mark Kaufman, Washington Post, Wed. Oct. 16, 2002 ("The fast-food industry generally argues that its products are a healthful part of a balanced diet, but critics say that heavy advertising of high-calorie fried foods encourages people to eat unwisely."); Barbara F. Meltz, "Just Say 'Phooey' to the Food/Fun Link," Boston Globe, at H.6 (11/14/02), 2002 WL 101983569 ("If children eat fast food once a week, it likely will not contribute to a health problem; if they eat it three or more times a week, it might.").

Of course, there are competing claims that cholesterol, fat, salt and sugar may not be so bad after all. E.g., Gary Taube, What If It's All Been a Big Fat Lie?, New York Times Magazine (July 7, 2002) (arguing that the high-fat Atkins Diet is more successful than low-fat, high-carbohydrate diets), available at www.nytimes.com/2002/07/07/magazine/07FAT.html (last visited Jan. 6, 2003). But see Bonnie Liebman, Big Fat Lies: The Truth About the Atkins Diet, Nutrition Action Health Letter 1 (November 2002) (providing point-by-point refutation of Taube's claims).

**21.** See Testimony of Juliet Gellatley, in McDonalds v. Steele (cited in Pls.' Mem. at 47–48) ("[S]ome younger children openly admitted that they pester their parents to take them to McDonalds, even if the parent is not keen.").

### i. Plaintiffs' Claim that McDonalds' Products Are More Dangerous Than the Average Hamburger, Fries and Shake

For the first time in their opposition papers, the plaintiffs attempt to show that over-consumption of McDonalds is different in kind from, for instance, over-consumption of alcoholic beverages or butter because the processing of McDonalds' food has created an entirely different—and more dangerous—food than one would expect from a hamburger, chicken finger or french fry cooked at home or at any restaurant other than McDonalds. They thus argue that McDonalds' food is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) Torts § 402A, cmt. i. If true, consumers who eat at McDonalds have not been given a free choice, and thus liability may attach.

The argument is akin to one that might be used in a products liability case regarding genetically engineered food,[22] should any injuries result from the excessive consumption thereof. The genetically modified soybean, potato and ear of corn [23] look exactly like the organically grown soybean, spud and corn. Yet those plants have been substantively, if subtly, modified into something else. Any dangers from eating a genetically modified plant are latent—and thus not commonly well known—in the absence of a label revealing that the object that looks like a soybean is actually a soybean carrying a brazil nut protein.[24]

---

**22.** Genetic engineering is the process by which scientists make modifications of the deoxyribonucleic acid (DNA) of an organism by uniting it with plant or animal genes with particular traits. Heather N. Ellison, Genetically Modified Organisms: Does the Current Regulatory System Compromise Consumer Health?, 10 Penn. St. Envtl. L.Rev. 345, 346 (Summer 2002). Recombinant DNA (rDNA) techniques permit a scientist to identify and copy a specific gene and introduce the gene copies into recipient organisms, such as a food crop. Id.; see also Lara Beth Winn, Special Labeling Requirements for Genetically Engineered Food: How Sound Are the Analytical Frameworks Used by FDA and Food Producers?, 54 Food & Drug L.J. 667, 668 (1999). This is done to introduce attributes of the transferor organism into the transferee organism. Id. Genetic engineering has resulted, for example, in a tomato that delays softening, an insect-protected potato and a virus-resistant squash. Jeffrey K. Francer, Frankenstein Foods or Flavor Savers?: Regulating Agricultural Biotechnology in the United States and European Union, 7 Va. J. Soc. Pol'y & L. 257, 262 (Winter 2000). In the year 2000, genetically modified seeds supplied approximately 38 percent of the United States corn crop, 57 percent of the soybean crop and 70 percent of the canola crop. Kelly A. Leggio, Limitations on the Consumer's Right to Know: Settling the Debate Over Labeling of Genetically Modified

Foods in the United States, 38 San Diego L.Rev. 893, 905 (Summer 2001). Although genetic engineering thus far has apparently only been beneficial, there are concerns that genetically modified foods could have far-reaching health effects that have not been accounted for, such as causing allergic reactions and creating antibiotic resistance in consumers. Francer, supra, at 292–294; Leggio, supra, at 903.

**23.** Although not relevant to this case, it is worthwhile to note that McDonalds has had experience with the fear of genetically modified foods. In the fall of 1999, protesters dumped manure and rotting vegetables outside of McDonalds restaurants in France, accusing McDonalds of contaminating their food with genetically modified crops. Francer, supra, at 258. In light of the protests, British McDonalds removed genetically modified foods from the menu that year, id., and in the United States in the spring of 2000, McDonalds informed its french fry suppliers that it would no longer purchase frozen french fries made from genetically engineered potatoes, in response to the consumer backlash in Europe. Schlosser, supra, at 269.

**24.** Pioneer Hi–Bred International, an Iowa agricultural life sciences company, added a Brazil-nut protein to soybeans in order to enhance the soybean's growing power. While

Similarly, plaintiffs argue that McDonalds' products have been so altered that their unhealthy attributes are now outside the ken of the average reasonable consumer. They point to McDonalds' ingredient lists to show that McDonalds' customers worldwide are getting much more than what is commonly considered to be a chicken finger, a hamburger, or a french fry. Schlosser, *supra*, at 7 ("Foods that may look familiar have in fact been completely reformulated.").

For instance, Chicken McNuggets, rather than being merely chicken fried in a pan, are a McFrankenstein creation of various elements not utilized by the home cook. A Chicken McNugget is comprised of, in addition to chicken:

> water, salt, modified corn starch, sodium phosphates, chicken broth powder (chicken broth, salt and natural flavoring (chicken source)), seasoning (vegetable oil, extracts of rosemary, mono, di- and triglycerides, lecithin). Battered and breaded with water, enriched bleached wheat flour (niacin, iron, thiamine, mononitrate, riboflavin, folic acid), yellow corn flour, bleached wheat flour, modified corn starch, salt, leavening (baking soda, sodium acid pyrophosphate, sodium aluminum phosphate, monocalcium phosphate, calcium lactate), spices, wheat starch, dried whey, corn starch. Batter set in vegetable shortening. Cooked in partially hydrogenated vegetable oils, (may contain partially hydrogenated soybean oil and/or partially hydrogenated corn oil and/or partially hydrogenated canola oil and/or cottonseed oil and/or corn oil). TBHQ and citric acid added to help preserve freshness. Dimethylpolysiloxane added as an anti-foaming agent.

Pls.' Mem. at 23 (*citing* McDonalds ingredient list). In addition, Chicken McNuggets, while seemingly a healthier option than McDonalds hamburgers because they have "chicken" in their names, actually contain twice the fat per ounce as a hamburger. Schlosser, *supra*, at 140. It is at least a question of fact as to whether a reasonable consumer would know—without recourse to the McDonalds' website—that a Chicken McNugget contained so many ingredients other than chicken and provided twice the fat of a hamburger.

Similarly, it is hardly common knowledge that McDonalds' french fries are comprised, in addition to potatoes, of:

> partially hydrogenated soybean oil, natural flavor (beef source), dextrose, sodium acid pyrophosphate (to preserve natural color). Cooked in partially hydrogenated vegetable oils, (may contain partially hydrogenated soybean oil and/or partially hydrogenated corn oil and/or partially hydrogenated canola oil and/or cottonseed oil and/or corn oil). TBHQ and citric acid added to preserve freshness. Dimethylpolysiloxane added as an anti-foaming agent.[25]

completing safety testing, researchers discovered that the soybean also retained the Brazil nut's human allergenic traits. Although the soybeans were intended only for use as animal feed, the product was not marketed due to fears of human consumption. Francer, *supra*, at 292.

**25.** Indeed, the taste of McDonalds fries depends largely on what is added to the fries—the cooking oil in which they are fried. As Schlosser reports:

> Their distinctive taste does not stem from the type of potatoes that McDonalds buys, the technology that processes them, the restaurant equipment that fries them. Other chains buy their french fries from the same large processing companies, use Russet Burbanks, and have similar fryers in their restaurant kitchens. The taste of a fast food fry is largely determined by the cooking oil. For decades [until 1990], McDonalds cooked its french fries in a mixture of about 7 percent cottonseed oil and 93 percent beef tallow. The mix gave the fries their unique flavor—and more saturated beef fat per ounce than a McDonalds hamburger.

Schlosser, *supra*, at 120.

This argument comes closest to overcoming the hurdle presented to plaintiffs. If plaintiffs were able to flesh out this argument in an amended complaint, it may establish that the dangers of McDonalds' products were not commonly well known and thus that McDonalds had a duty toward its customers. The argument also addresses McDonalds' list of horribles, *i.e.*, that a successful lawsuit would mean that "pizza parlors, neighborhood diners, bakeries, grocery stores, and literally anyone else in the food business (including mothers cooking at home)" (Defs.' Mem. at 3), could potentially face liability. Most of the above entities do not serve food that is processed to the extent that McDonalds' products are processed, nor food that is uniform to the extent that McDonalds' products are throughout the world. Rather, they serve plain-jane hamburgers, fries and shakes—meals that are high in cholesterol, fat, salt and sugar, but about which there are no additional processes that could be alleged to make the products even more dangerous. In addition, there is the problem of causation; hardly any of the entities listed above other than a parent cooking at home serves as many people regularly as McDonalds and its ilk.[26]

In response to this argument, McDonalds claims that, even if true, it is also a matter of common knowledge that any processing that its foods undergo serve to make them more harmful than unprocessed foods. Defs.' Reply Mem. at 12–13. It is premature to speculate as to whether this argument will be successful as a matter of law if the plaintiffs amend their complaint to include these allegations, as neither argument has been more than cursorily presented to the Court and certainly is not properly before it. McDonalds' argument is insufficient, however, to convince this Court that the plaintiffs should not have the opportunity to amend their complaint to include these allegations.

### ii. *Allergic Sensitivity*

Plaintiffs also argue in their papers, less successfully, that McDonalds has a duty to plaintiffs because they have an "allergic sensitivity" to McDonalds fare. *E.g.*, Restatement (Third) Torts: Product Liability, § 2 (1998).

To state such a claim, however, "the ingredient that causes the allergic reaction must be one whose danger or whose presence in the product is not generally known to consumers. When both the presence of an allergenic ingredient in the product and the risks presented by such an ingredient are widely known, instructions and warnings about that danger are unnecessary." *Id.; see also Kaempfe v. Lehn & Fink Prods. Corp.*, 21 A.D.2d 197, 200–01, 249 N.Y.S.2d 840, 845 (1st Dep't 1964) (holding that existence of duty depends upon manufacturer's actual or constructive knowledge that product contains ingredient to which substantial number of population is allergic) (*citing* Tentative Draft No. 7 of Restatement (Second) Torts).

As noted above, there are no allegations in the Complaint with regard to this claim. Plaintiffs have not alleged that cholesterol, fat, salt and sugar—or any other ingredients in McDonalds products—are "allergens," nor have they made the case that the existence and effects of such ingredients are unknown to the public at large. In the absence of such allegations, the theory fails.

### iii. *Foreseeable Misuse*

Plaintiffs also attempt to ground a duty in a claim that eating McDonalds with high

---

**26.** McDonalds claims to have served "over 99 billion," and each day services approximately 46 million customers. Pl.'s Mem. at 2. McDonalds, with approximately 13,000 outlets in the United States, has a 43 percent share of the United States fast food market. *Id.*

frequency is a "misuse" of the product of which McDonalds is aware. Again, such allegation was not in the Complaint, and, in any case, plaintiffs fail to allege even in their papers that what is at issue is a misuse "in the sense that it was outside the scope of the apparent purpose for which the [products] were manufactured." *Trivino v. Jamesway Corp.*, 148 A.D.2d 851, 852, 853, 539 N.Y.S.2d 123 (3rd Dep't 1989). McDonalds' products were manufactured for the purpose of being eaten, and the injuries complained purportedly resulted from the eating of those products. Plaintiffs cite no case law to support the contention that over-consumption of a food product may be considered a misuse. If they amend their complaint to include an allegation based on misuse, they had better be prepared to do so.

A better argument based on over-consumption would involve a claim that McDonalds' products are unreasonably dangerous for their intended use. The intended use of McDonalds' food is to be eaten, at some frequency that presents a question of fact. If plaintiffs can allege that McDonalds products' intended use is to be eaten for every meal of every day, and that McDonalds is or should be aware that eating McDonalds' products for every meal of every day is unreasonably dangerous, they may be able to state a claim.

### iv. *The NLEA*

Plaintiffs finally attempt to rely on the NLEA, arguing that any finding that McDonalds does not have to label its foods would mean that the NLEA is not worth the paper it is written upon. Plaintiffs' bizarre argument confuses the instant case—a common law negligence and state statutory cause of action—with any enforcement proceedings by the federal government to ensure that those covered by the NLEA (from which McDonalds and other restaurants are exempt, as discussed above) have the nutritional labeling required by the act. Any determination in this case has nothing to do with whether Haagen–Daaz must include a label as to the nutritional contents of a pint of ice cream. Plaintiffs might just as well argue that this case will affect the labeling of tea in China.

Because Count III has failed to state a claim, it is dismissed.

### 2. *Proximate Cause*

McDonalds also argues that Count III should be dismissed because the plaintiffs may not as a matter of law allege that the unhealthy attributes of McDonalds' products were the proximate cause of their obesity and other health problems.[27]

In order to show proximate cause, a plaintiff must establish that the defendant's conduct was a substantial cause in

27. As an initial matter, plaintiffs object that McDonalds' arguments as to duty and proximate cause are contradictory and self-serving. They argue that McDonalds cannot, on one hand, state that it is obvious that eating McDonalds' food will cause the injuries complained of, and then argue that plaintiffs have failed to demonstrate that eating McDonalds' food is the proximate cause of their injuries. McDonalds' point, however, is not that the plaintiffs became obese necessarily for some reason other than their diet of foods high in cholesterol, fat, salt and sugar, but that it is impossible as a matter of law to blame one restaurant chain—even one responsible for up to seven meals a week of a plaintiff—when the plaintiffs were eating other foods (perhaps from other restaurants), were engaged in a lifestyle that may or may not have included an appropriate physical regimen, and when their weights were potentially influenced by a host of other factors, such as heredity, the environment, society, etc. Plaintiffs must get over this hurdle to survive a motion to dismiss, and, as discussed *infra*, the Complaint fails to do so.

bringing about the harm. *Elsroth v. Johnson & Johnson*, 700 F.Supp. 151, 166 (S.D.N.Y.1988) (*citing Derdiarian v. Felix Contracting Corp.*, 51 N.Y.2d 308, 316, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666 (1980)); *see also Restatement (2d) of Torts* § 431 (1965). "The word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable [persons] to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called 'philosophic sense,' which includes every one of the great number of events without which any happening would not have occurred." Restatement (Second) Torts § 431, cmt. a.

Several factors are considered, including "the aggregate number of actors involved which contribute towards the harm and the effect which each has in producing it," and "whether the situation was acted upon by other forces for which the defendant is not responsible." *Transamerica Ins. Fin. Corp. v. Fireman's Fund Ins. Co.*, No. 89 Civ. 8625(PNL), 1992 WL 350800, at *9 (S.D.N.Y. Nov.19, 1992) (*quoting Mack v. Altmans Stage Lighting Co.*, 98 A.D.2d 468, 470–71, 470 N.Y.S.2d 664, 667 (2d Dep't 1984) (*citing* Restatement (Second) of Torts § 433)); *see also Elsroth*, 700 F.Supp. at 166 ("[W]e are particularly mindful of Professor Prosser's observation that 'no case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it.' ") (*quoting* W. Prosser, *Handbook of the Law of Torts*, § 41 at 240 (4th ed.1971) (applying New York law)).

The issue of proximate cause may be determined as a matter of law where no reasonable person could find causation based on the facts alleged in the complaint. *E.g., Smith v. Stark*, 67 N.Y.2d 693, 694, 499 N.Y.S.2d 922, 923, 490 N.E.2d 841 (1986) (granting summary judgment where there was no causation as matter of law in duty to warn context); *Howard v. Poseidon Pools, Inc.*, 72 N.Y.2d 972, 974, 534 N.Y.S.2d 360, 361, 530 N.E.2d 1280 (1988) (noting that question of legal cause may be decided as a matter of law where only one conclusion may be drawn from the established facts).

No reasonable person could find probable cause based on the facts in the Complaint without resorting to "wild speculation." *Price v. Hampson*, 142 A.D.2d 974, 975–76, 530 N.Y.S.2d 392, 394 (4th Dep't 1988) (ruling on causation as matter of law as jury could find causation only by engaging in "wild speculation").

First, the Complaint does not specify how often the plaintiffs ate at Mc-Donalds.[28] The class action proposed by plaintiffs could consist entirely of persons who ate at McDonalds on one occasion. As a result, any number of other factors then potentially could have affected the plaintiffs' weight and health. In order to survive a motion to dismiss, the Complaint at a minimum must establish that the plaintiffs ate at McDonalds on a sufficient number of occasions such that a question of fact is raised as to whether McDonalds'

---

**28.** Plaintiffs have attached affidavits to their opposition papers to respond to this issue. *E.g.*, J. Bradley Aff. at ¶ 4 ("While on my way to school and during school lunch breaks, I mostly ate at McDonalds restaurants."); N. Bradley Aff. at ¶ 5 ("I go to McDonalds once a day for breakfast for the eggs and sausages and muffins[,] and I also go for lunch."); S. Bradley Aff. at ¶ 5 ("While on my way to school and during school lunch breaks, I mostly ate at McDonalds restaurants."); A. Pelman Aff. at ¶ 6 ("Between the ages of five and twelve[,] I used to go to McDonalds approximately three to four times a week."); W. Sgaglione Aff. at ¶ 6 ("Between the ages of three and twelve[,] I ate at McDonalds three to four times a week.").

products played a significant role in the plaintiffs' health problems. While the assignment of such a frequency is beyond the competency of this Court at this time, it seems like the frequency must be more than once per week—a figure cited by plaintiffs' counsel in oral argument as a potentially not unhealthy figure.[29] Naturally, the more often a plaintiff had eaten at McDonalds, the stronger the likelihood that it was the McDonalds' food (as opposed to other foods) that affected the plaintiffs' health.

Second, McDonalds points out that articles on which plaintiffs rely in their Complaint suggest that a number of factors other than diet may come into play in obesity and the health problems of which plaintiffs complain. *E.g.*, National Institutes of Health, *Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults*, at xi, 27 (1998) (cited in Compl. at 5–6 nn. 6, 8, 13, 14) ("Obesity is a complex multifactoral chronic disease developing from interactive influences of numerous factors—social behavioral, physiological, metabolic, cellular,

and molecular" in addition to cultural and genetic factors); *The Surgeon General's Call to Action to Prevent and Decrease Overweight and Obesity*, at 1 (2001) (citing in Compl. at 4–7, nn. 3, 4, 9, 15, 16) ("Overweight and obesity are caused by many factors. For each individual, body weight is determined by a combination of genetic metabolic, behavioral, environmental, cultural, and socioeconomic influences.").

As a result, in order to allege that McDonalds' products were a significant factor in the plaintiffs' obesity and health problems, the Complaint must address these other variables and, if possible, eliminate them or show that a McDiet is a substantial factor despite these other variables. Similarly, with regard to the plaintiffs' health problems that they claim resulted from their obesity (which they allege resulted from their McDonalds habits), it would be necessary to allege that such diseases were not merely hereditary or caused by environmental or other factors.[30]

Because the Complaint fails to allege that the danger of the McDonalds' prod-

---

**29.** Counsel was referring to advertisements run by McDonalds restaurants in France stating that children should eat at McDonalds at most only once a week. *E.g.*, McD refutes own French ads, Nation's Restaurant News 3, 2002 WL 102510885 (Nov. 11, 2002) ("The ad, from a campaign in France that promoted McDonald's meals as a part of a balanced weekly diet, quoted a nutritionist as saying "there's no reason to abuse fast food or visit a McDonald's more than once a week .... " "); *see also* Barbara F. Meltz, "Just Say 'Phooey' to the Food/Fun Link," Boston Globe, at H.6 (11/14/02), 2002 WL 101983569 ("If children eat fast food once a week, it likely will not contribute to a health problem; if they eat it three or more times a week, it might."). McDonalds Corp. issued a statement on October 30, 2002, that the company "strongly disagreed" with the nutritionist's advice. Restaurant News, at 3.

**30.** Because of the possibility of the myriad factors involved in alleging proximate cause, plaintiffs may well be unable to justify class certification. A plaintiff seeking class certification bears the burden of demonstrating that the class satisfies the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *E.g.*, *Marisol A. v. Giuliani*, 126 F.3d 372, 375 (2d Cir.1997). Additionally, a plaintiff must demonstrate that the proposed class action fits within one of the three categories described Fed.R.Civ.P. 23(b). *E.g.*, *Green v. Wolf Corp.*, 406 F.2d 291, 298 (2d Cir.1968). It is difficult to imagine how the typicality requirement would be satisfied, as any named plaintiff's injuries would necessarily be a product of the particular variables surrounding the plaintiff, whether social, environmental or genetic. ·In addition, it is unclear if plaintiffs can meet their obligation of showing that the case is manageable as a class action. *E.g.*, *The National Asbestos Workers Med. Fund v. Philip Morris, Inc.*, No. 98 Civ. 1492, 2000 WL 1364358, at *1, 2000 U.S. Dist. LEXIS 13562, at *5 (E.D.N.Y. Sept. 20, 2000) (*citing*

ucts were not well-known and fails to allege with sufficient specificity that the McDonalds' products were a proximate cause of the plaintiffs' obesity and health problems, Count III shall be dismissed.

## B. Count IV: Failure to Warn of Unhealthy Attributes

Count IV alleges a failure to warn of the unhealthy attributes of McDonalds' products. While the cause of action differs from Count III, McDonalds' arguments that this claim fails because the dangers of its fare were well-known and that plaintiffs have failed to show proximate cause are nonetheless applicable.

In *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 677 N.Y.S.2d 764, 700 N.E.2d 303 (1998), the New York Court of Appeals summarized the current State of New York law with regard to a manufacturer's liability for failure to warn in a products liability case:

> "A manufacturer has a duty to warn against latent dangers resulting from foreseeable uses of its product of which it knew or should have known. A manufacturer also has a duty to warn of the danger of unintended uses of a product provided these uses are reasonably foreseeable .... [A] manufacturer may be liable for failing to warn against the dangers of foreseeable misuse of the

product .... A manufacturer's superior position to garner information and its corresponding duty to warn is no less with respect to the ability to learn of ... misuse of a product ...."

*Id.* at 237–41, 677 N.Y.S.2d 764, 700 N.E.2d 303.

▮▮▮ The standard for evaluating failure to warn liability is "intensely fact-specific, including but not limited to such issues as feasibility and difficulty of issuing warnings in the circumstances ...; obviousness of the risk from actual use of the product; knowledge of the particular product user; and proximate cause." *Id.* at 243, 677 N.Y.S.2d 764, 700 N.E.2d 303. The factual determination of whether an adequate warning was given is "often interwoven with the question of whether the defendant manufacturer has a duty to warn, and if so, to whom that duty is owed." *Cooley v. Carter–Wallace, Inc.*, 102 A.D.2d 642, 644, 478 N.Y.S.2d 375, 376 (4th Dep't 1984).

▮▮▮▮ In duty to warn cases, New York recognizes two circumstances that would preclude a finding of proximate cause: (1) obviousness and (2) the knowledgeable user. *Andrulonis v. United States*, 924 F.2d 1210, 1222 (2d Cir.), vacated 502 U.S. 801, 112 S.Ct. 39, 116 L.Ed.2d 18, *and reinstated*, 952 F.2d 652 (2d Cir. 1991). McDonalds alleges only the former.[31]

---

Amchem Prods., 521 U.S. at 616, 117 S.Ct. 2231, 138 L.Ed.2d 689 (finding "difficulties likely to be encountered in the management of a class action" pertinent to Rule 23(b)(3) analysis); *Blyden v. Mancusi*, 186 F.3d 252, 271 (2d Cir.1999) (evaluating the "management issue")).

**31.** While the plaintiffs argue in opposition to this motion that they, as infants, cannot be "knowledgeable users," (Pls.' Mem. at 25), McDonalds relies only on the objective open and obvious defense to support its motion. Therefore, plaintiffs' knowledgeable users arguments will not be addressed.

The confusion of the two concepts would appear to explain some of the arguments between the parties as to whether an objective or subjective standard should be considered. Pursuant to the "knowledgeable user" defense, proximate cause cannot be found where the plaintiff is a knowledgeable user who is actually aware of the dangerous nature of the product supplied. *E.g., Andrulonis v. United States*, 924 F.2d 1210, 1222 (2d Cir.), vacated 502 U.S. 801, 112 S.Ct. 39, 116 L.Ed.2d 18, *and reinstated*, 952 F.2d 652 (2d Cir.1991); *In re New York Asbestos Litig.*, 847 F.Supp. 1086, 1106 (S.D.N.Y.1994); *Belling v. Haugh's Pools Ltd.*, 126 A.D.2d 958, 511

■ Pursuant to the "open and obvious" exception, a manufacturer may not be liable for a failure to warn if the risks were sufficiently obvious to the user without a warning. *Andrulonis v. United States*, 924 F.2d 1210, 1222 (2d Cir.1991) ("[T]he focus of the 'obviousness' inquiry is upon the objective reasonableness of the supplier's judgment about whether users will perceive the danger.... The danger must be so apparent or so clearly within common knowledge that a user would appreciate the danger to the same extent that a warning would provide.") (citations omitted).

■ The open and obvious defense will not apply "when there are aspects of the hazard which are concealed or not reasonably apparent to the user ...." *Liriano*, 92 N.Y.2d at 241–42, 677 N.Y.S.2d 764, 700 N.E.2d 303; *see also Anderson v. Hedstrom Corp.*, 76 F.Supp.2d 422, 448 (S.D.N.Y.1999) (denying summary judgment motion because as a matter of law the danger of jumping on trampolines was not so obvious that trampoline manufacturer need not have including warnings (1) that risk-reducing cages were available on the market and (2) that users should jump only in the center, with proper ground covering, or with professional supervision or spotter); *Jiminez v. Dreis & Krump Mfg. Co.*, 736 F.2d 51, 55 (2d Cir.1984) (finding as a matter of law that it was not obvious that injury would result to operator who had not activated machine at all, even though it was obvious that injury could result to an operator who had activated, either intentionally or accidentally, the machine).

■ Because of the difficulty in administering this test, the question of whether a danger is open and obvious is usually a jury question unless only one conclusion may be drawn from the established facts. *Liriano*, 92 N.Y.2d at 241–42, 677 N.Y.S.2d 764, 700 N.E.2d 303 ("The fact-specific nature of the inquiry into whether a particular risk is obvious renders bright-line pronouncements difficult, and in close cases it is easy to disagree about whether a particular risk is obvious. It is hard to set a standard for obviousness that it neither under- nor over-inclusive.").

■ As discussed above, the Complaint fails to allege that the McDonalds' products consumed by the plaintiffs were dangerous in any way other than that which was open and obvious to a reasonable consumer. While the plaintiffs have presented the outline of a substantial argument to the contrary in their papers, as discussed *supra*, their theory is not supported in their Complaint, and thus cannot save Count IV from dismissal. In addition, as also discussed above, the Complaint does not allege with sufficient specificity that the plaintiffs' consumption of McDonalds' products was a significant factor in their

---

N.Y.S.2d 732, 733 (1987). The "knowledgeable user" defense thus employs a subjective standard, *Andrulonis*, 924 F.2d at 1222, while the "open and obvious" defense employs an objective standard. *Tompkins v. R.J. Reynolds Tobacco Co.*, 92 F.Supp.2d 70, 87 (N.D.N.Y.2000); *see also Kerr v. Koemm*, 557 F.Supp. 283,. 286–87 (S.D.N.Y.1983) (distinguishing "obvious danger" exception from "knowledgable user" exception and explaining that the latter requires proof of subjective knowledge).

To the extent that plaintiffs are in fact arguing that the "open and obvious" danger exception should take into consideration the infant plaintiffs' ages and maturity, they have failed to cite case law in support of this proposition. By contrast, McDonalds cites several cases involving underage alcohol consumption that hold that minors should be held accountable for the same body of common knowledge of risks posed by alcohol consumption. *E.g., Robinson v. Anheuser–Busch, Inc.*, No. 00–D–300–N, *slip op.*, at 6–7 (M.D.Ala.2000) ("a minor's age does not neutralize any common knowledge about the dangers of alcohol consumption").

obesity and related health problems. As a result, Count IV must be dismissed.

## IV. *Count V: Sale of Addictive Products*

The exact basis of Count V is unclear. It appears to be a products liability claim, *i.e.*, McDonalds' products are inherently dangerous in that they are addictive. The claim may also be read to allege that McDonalds failed to warn its customers that its products were addictive.

This claim, unlike the one above based on unhealthy attributes, does not involve a danger that is so open and obvious, or so commonly well-known, that McDonalds' customers would be expected to know about it. In fact, such a hypothesis is even now the subject of current investigations. *See* Sarah Avery, "Is Big Fat the Next Big Tobacco?" Raleigh News & Observer, at A25, 2002 WL 11733461 (Aug. 18, 2002) ("[R]esearchers are investigating whether large amounts of fat in combination with sugar can trigger a craving similar to addiction. Such a finding would go far in explaining why fast-food sales have climbed to more than $100 billion a year ... despite years of warnings to limit fats."). Therefore, it does not run into the same difficulties discussed above with regard to clarifying that the unhealthy attributes are above and beyond what is normally known about fast food.

■■■ While it is necessary to accept as true the allegation in the Complaint that McDonalds' products are addictive for the purposes of this motion, such allegation standing alone is, nonetheless, insufficient as overly vague. The Complaint does not specify whether it is the combination of fats and sugars in McDonalds products, *id.*, that is addictive, or whether there is some other additive, that works in the

same manner as nicotine in cigarettes, to induce addiction. Further, there is no allegation as to whether McDonalds purposefully manufactured products that have these addictive qualities. In addition, the Complaint fails to specify whether a person can become addicted to McDonalds' products after eating there one time or whether it requires a steady diet of McDonalds in order to result in addiction. There is also no allegation as to whether plaintiffs, as infants, are more susceptible to the addiction than adults.

While some of these questions necessarily may not be answered until discovery (should this claim be replead and survive a motion to dismiss), and likely then only with the aid of expert witnesses, to allow a complaint to survive merely because it alleges product liability on the basis of addiction would be to allow any complaint that alleges product liability based on the addictive nature of the products to survive dismissal, even where such addiction is likely never to be proven. As a result, a complaint must contain some specificity in order to survive a motion to dismiss.

A claim that a product causes addiction and that reasonable consumers are unaware of that danger must at the very least (1) allege that the plaintiffs are addicted, with allegations revealing ways in which their addiction may be observed, and (2) specify the basis of the plaintiffs' belief that they and others became addicted to the product.[32] Further allegations addressing questions raised above would further strengthen the claim. In the absence of any such specific allegations, Count V must be dismissed.

In any case, as discussed above, the Complaint fails to allege sufficiently that the addictive nature of McDonalds' food

---

32. Such showings also suggest that plaintiffs will not be able to justify class certification.

*See supra* note 30.

and the plaintiffs' resulting ingestion thereof is a proximate cause of the plaintiff's health problems. As a result, Count V is dismissed.

### V. *Leave to Amend Is Granted.*

Fed.R.Civ.P. 15(a) requires that "leave [to amend] shall be freely given when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). When a motion to dismiss is granted, "the usual practice is to grant leave to amend the complaint." 2A Moore & Lucas, Moore's Federal Practice ¶ 12.14 at 12–99 (2d ed.1989); *see also Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986) (same rule for complaints dismissed under Rule 9(b)). Although the decision whether to grant leave to amend is within the discretion of the district court, refusal to grant leave must be based on a valid ground. *Foman*, 371 U.S. at 182, 83 S.Ct. 227. As a result, the plaintiffs may amend their complaint to address the deficiencies listed above.

### *Conclusion*

For the foregoing reasons, the Complaint is dismissed in its entirely. Leave is granted to replead all claims except for those based on New York City Administrative Code, Ch. 5, 20–700 *et seq.,* which are dismissed with prejudice. Any amended complaint should be filed within thirty (30) days of the issuance of this opinion.

It is so ordered.